## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE LAWYERS' COMMITTEE FOR 9/11 INQUIRY, INC.** | ) |
| 426 River Mill Road   Ext. | ) |
| Jersey Shore, PA 17740 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **ROBERT MCILVAINE** | ) |
| 322 Twining Rd | ) |
| Oreland, Pa. 19075 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **ARCHITECTS & ENGINEERS FOR 9/11 TRUTH** | ) |
| 2342 Shattuck Ave., | ) |
| Suite 189 Berkeley, CA 94704 | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.** _____ |
| | ) |
| **WILLIAM P. BARR,** | ) |
| **ATTORNEY GENERAL OF THE UNITED STATES;** | ) |
| **AND THE UNITED STATES DEPARTMENT OF JUSTICE** | ) |
| 950 Pennsylvania Avenue, NW | ) |
| Washington, D.C. 20530-0001 | ) |
| | ) |
| **AND** | ) |
| | ) |
| **CHRISTOPHER A. WRAY, DIRECTOR, AND THE** | ) |
| **FEDERAL BUREAU OF INVESTIGATION;** | ) |
| 935 Pennsylvania Avenue, NW | ) |
| Washington, D.C. 20535-0001 | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This is an action for declaratory and injunctive relief under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 702, 706, and the federal mandamus statute, 28 U.S.C. § 1361 (Mandamus Statute), related to federal agency failures to comply with a mandate from Congress related to the tragic events of September 11, 2001.

2.      Following those tragic events of 9/11 at the World Trade Center in New York City, at the Pentagon, and near Shanksville Pennsylvania, the Congress initiated a joint inquiry into the 9/11 terrorist attacks. This investigation was titled the "Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001," and was conducted jointly by the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence. The report from that investigation by Congress, which will be referred to hereafter as the Joint Congressional Inquiry, was released in December 2002, in part. The final section of that report, encompassing some twenty-eight pages, was withheld from the public until almost fourteen years later. On July 15, 2016, public pressure finally caused the release of those remaining "Twenty-Eight Pages", as the initially redacted final portion of that report came to be known. The 2002 Joint Congressional Inquiry which was limited in scope and partially secret, did not satisfy the public demand for a comprehensive investigation into the events of 9/11.

3.      Considerable public pressure from family members of the victims eventually caused the Congress via legislation signed by the President in November 2002 to establish the National Commission on Terrorist Attacks Upon the United States (commonly known as the "9/11 Commission"). The 9/11 Commission was tasked to prepare a full and complete account of the circumstances surrounding the September 11 attacks.

4.      The 9/11 Commission suffered from several publicly acknowledged limitations. For example, Co-Chair of the Commission former Congressman Lee Hamilton concluded that

the government established the 9/11 Commission in a manner designed to ensure that it would

fail. Commission Co-Chair Hamilton listed a number of reasons for reaching this conclusion,

including: the late establishment of the Commission; the short deadline imposed on its work;

insufficient funding; political opposition to the establishment of the Commission; continuing

political resistance and opposition to the work of the Commission by those who did not wish to

be blamed for what happened on 9/11; attempts to deceive and mislead the 9/11 Commission by

various key government agencies; and the denial of access by various agencies and officials to

documents, witnesses, and testimony under oath. Commission Co-Chair Hamilton stated that

there were all kinds of reasons that he and others on the Commission thought they were set up to

fail.

5.      Ultimately, the 9/11 Commission produced its own voluminous report which

made certain recommendations related to the FBI and other agencies and addressed some, but

not all, of the then-available evidence relating to the 9/11 attacks. The 9/11 Commission's 2004

report left many of the key questions of the 9/11 victims' family members (again) unanswered.

The members of the 9/11 Commission themselves acknowledged that additional evidence

relating to the attacks would likely be brought forward after their report was issued. Over the ten

years that followed, significant additional evidence regarding the 9/11 attacks was in fact

publicly reported, in some cases as a result of on-going federal government inquiries, and in

some cases as a result of on-going inquiries by concerned citizens and non-profit organizations.

6.      In January 2014, the Congress mandated a new 9/11 related inquiry by the Federal

Bureau of Investigation (FBI). At this time, the Congress mandated that the FBI conduct a

comprehensive external review of the implementation of the recommendations related to the FBI

that were proposed in the report issued by the 9/11 Commission. Specifically included in this

mandate was the requirement that the FBI and the external review body it created in implementing this external review (which ultimately became known as the 9/11 Review Commission), assess any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001. Further, the Congress mandated that the FBI shall submit a report to the relevant committees of the Congress on the findings and recommendations resulting from this review. The Congress in its mandate encouraged the FBI in carrying out this review to draw upon the experience of 9/11 Commissioners and staff.

7.      The instant action has been brought because the Federal Government Defendants have failed to comply with this Congressional mandate that imposed a mandatory duty on Defendants to perform an assessment of any evidence known to the FBI that was not considered by the original 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, and report that assessment to Congress. Defendants failed to comply with this mandate from Congress in several ways, as reflected in the FBI 9/11 Review Commission's Report, completed and released March 25, 2015, and as described in the separate Counts of this Complaint. Plaintiffs seek an order requiring Defendants to fully comply with this important mandate from Congress.

**JURISDICTION**

8.      This court has jurisdiction over this action pursuant to 28 U.S.C. § § 1331, 1346, and 1361.

**VENUE**

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b), (e).


**PLAINTIFFS**

10.     Plaintiff Lawyers' Committee for 9/11 Inquiry, Inc. (hereafter "Lawyers' Committee") is a Pennsylvania non-profit corporation. The mission of the Lawyers' Committee is to promote transparency and accountability regarding the tragic events of September 11, 2001 (9/11). The Lawyers' Committee believes that the family members of the victims of the tragic crimes of 9/11 have a compelling right to know the full truth of what happened to their loved ones on 9/11, and that Congress and the Department of Justice, in order to do their jobs, have a compelling need to know. The Lawyers' Committee has a special interest in the Defendants complying with the mandate from Congress that the Defendants perform an assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001. A public evaluation and report to Congress by Defendants regarding the 9/11 related evidence addressed in this Complaint that Defendants failed to assess during the work of the Defendants' 9/11 Review Commission would promote both of the primary goals in the Lawyers' Committee's non-profit mission: transparency and accountability regarding the tragic events of 9/11. These are important organizational interests distinct from the general public interest in seeing government agencies comply with the law. Plaintiff Lawyers' Committee is a plaintiff in this action for purposes of all counts stated herein.

11.     Plaintiff Architects & Engineers for 9/11 Truth (AE) is a non-profit organization, incorporated in California, that has conducted an independent multi-year scientific investigation

of the causes of the collapse of the WTC towers and WTC Building 7 on 9/11. AE's mission includes investigation and education of the public as to the true reasons these WTC buildings collapsed on 9/11. This is an important organizational interest distinct from the general public interest in seeing government agencies comply with the law.

12.     Plaintiff AE joins this action as a plaintiff for purposes of Counts I.A., I.B., II.A., II.B., III.A. and III.B only.

13.     Plaintiff Robert McIlvaine is the father of Bobby McIlvaine. Bobby McIlvaine was killed at the World Trade Center on 9/11. If the Defendants are ordered to comply with the mandate from Congress that they perform an assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, the result of such an FBI investigation and report to Congress regarding the 9/11 related evidence addressed in this Complaint that Defendants have heretofore failed to assess or include in their 9/11 Review Commission Report is reasonably expected to result in a better public understanding of the events of 9/11 and possibly disclosure of criminal conduct or government malfeasance, misfeasance or non-feasance not previously known by the public. The resulting public disclosures will provide a more complete picture of the truth of what happened on 9/11, assisting the family members of the 9/11 victims, including Robert McIlvaine, in coming to closure regarding this tragedy. This is an important personal interest, shared only by the family members of the other 9/11 victims, and is distinct from the general public interest in seeing government agencies comply with the law. Plaintiff Robert McIlvaine is a plaintiff in this action for purposes of all counts stated herein.

**DEFENDANTS**

14.     Defendants United States Department of Justice (DOJ) and the FBI are the agencies mandated by Congress to perform an assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001.

15.     Defendant William P. Barr is the current Attorney General of the United States, who is in charge of the DOJ.

16.     Defendant Christopher A. Wray is the current Director of the FBI.

**FACTS COMMON TO ALL COUNTS**

17.     The preceding paragraphs are incorporated herein by reference.

18.     Following the issuance of the aforementioned January 2014 mandate from Congress, the then-FBI Director, in consultation with Congress, for the purpose of implementing this mandate from Congress, appointed three commissioners to what became known as the 9/11 Review Commission. Those commissioners were former Attorney General Edwin Meese, former Congressman and Ambassador Tim Roemer, who also served as a member of the original 9/11 Commission, and Professor and counterterrorism expert Bruce Hoffman of Georgetown University.

19.     In February 2014, the commissioners appointed as Executive Director, John Gannon, former Central Intelligence Agency (CIA) Deputy Director for Intelligence and ex-Chairman of the National Intelligence Council.

20.     The Executive Director, working with the commissioners and coordinating with the Bureau, assembled a staff that eventually numbered 12 individuals: two former senior

intelligence officers, one former assistant US Attorney (and previously a Senior Counsel on the original 9/11 Commission) detailed from the MITRE Corporation, one trial attorney detailed from the Department of Justice (DOJ), one retired senior Congressional (intelligence committees) staffer, two senior counterterrorism experts detailed from the RAND Corporation, two senior analysts detailed from the Defense Intelligence Agency (DIA), two personnel detailed from the FBI, and one former federal and military prosecutor currently in private practice in Washington.

21.     The Review Commission produced a conceptual framework intended to guide the staff's review and production of a report. The framework contained five objectives around which four staff teams were organized. The commissioners presented this framework in testimony before the Commerce, Justice, Science, and Related Agencies Subcommittee of the House Appropriations Committee on March 26, 2014.

22.     Four team leaders were identified and assigned to lead the specific lines of inquiry stated in the commissioners' March Congressional testimony: (1) a baseline assessment of where the Bureau is today in its transition to a threat-based, intelligence-driven organization and "the development of an institutional culture imbued with deep expertise in intelligence and national security;" (2) an analysis of institutional lessons learned and practical takeaways from the assessment of five high-profile counterterrorism cases that occurred in the past six years; (3) an evaluation of the FBI's current state of preparedness to address the rapidly evolving, global threat environment of the next decade—including escalating cyber intrusions, proliferating numbers of foreign fighters, and increasingly adaptive terrorist activities; and (4) an examination of the Bureau's current and future need for closer collaboration and information sharing with strategic partners inside and outside government, and with other federal, state, local, tribal, and

international counterparts. In addition, and significantly in regard to the instant Complaint, the

Review Commission produced a fifth chapter [no team leader assigned] summarizing its effort to

identify any evidence "now [then] known to the FBI that was not considered by the 9/11

Commission related to any factors that contributed in any manner to the terrorist attacks of

September 11, 2001."

23.     The FBI's 9/11 Review Commission in its Report at page 100 notes that the FBI's

New York and San Diego Field Offices have continued to investigate 9/11.    The FBI's 9/11

Review Commission in its Report at page 100 significantly notes that "The Review Commission

found that the FBI, to its credit, still has the 9/11 attacks and any potential conspiracy

surrounding them, under active investigation."    The Commission, in its Report at page 114,

notes that "The Review Commission heard informative briefings from the Bureau's Science and

Technology Branch … on its bold efforts to keep apace of rapid advances in information

technology, … forensics, and other sciences that relate to both the agent's investigative tradecraft

and the adversary's capabilities."

24.     Given these facts, it is virtually certain that the FBI has, over the years since the

9/11 Commission Report was published in 2004, reviewed, as part of its intelligence collection

activities, information placed on the web regarding the scientific evidence of explosive

demolition of three WTC towers on 9/11, the First Responder eyewitness reports published by

the New York Times, and the other categories of evidence described in the Counts of this

Complaint presented *infra*.

25.     The FBI and the FBI's 9/11 Review Commission, given these facts, would, with

virtual certainty, have been aware of the 9/11 related evidence addressed in the Counts presented

below as a result of various reports on the web and in public presentations. Discovery is expected to confirm these facts.

26.     The FBI's 9/11 Review Commission on Page 100 of its Report notes, significantly in this regard, that it reviewed press accounts looking for new evidence which caused it to make two specific inquiries. The Report states, at page 100, that "The Review Commission also investigated two claims of allegedly new evidence reported in the press—an FBI source with purported access to Usama bin Laden (UBL) in the early 1990s and a Sarasota family that was alleged to have suspiciously left the United States shortly before the 9/11 attacks." Notably, in regard to the press report regarding the suspicious Sarasota family, the FBI's 9/11 Review Commission made significant additional inquiries into that matter.    The FBI's 9/11 Review Commission on page 106 of its Report describes these inquires as follows. "The Review Commission requested and received a briefing regarding the press allegations. The Review Commission also obtained a copy of the case file, copies of documents released through the Freedom of Information Act regarding the matter, and reports of interviews."

27.     However, as described *infra*, the FBI's 9/11 Review Commission, and the FBI itself, failed to assess and report to Congress, as mandated, several other categories of significant 9/11 related evidence known to the FBI via reports in the press, via the web, and via public events and/or reflected in the FBI's own records.

**COUNT I.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS' FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING EVIDENCE RELATED TO USE OF PRE-PLACED EXPLOSIVES AND/OR INCENDIARIES TO DESTROY THREE WORLD TRADE CENTER BUILDINGS ON 9/11.**

28.     This is an action pursuant to the Administrative Procedures Act to compel agency action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary, capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be not in accordance with law; and to hold unlawful and set aside agency action found to be in excess of statutory authority or limitations, or short of statutory right.

29.     All of the foregoing and subsequent paragraphs are incorporated herein by reference.

30.     The 9/11 Commission did not address the substantial publicly available evidence that the collapses of WTC1, WTC2, and WTC7 were due to the use of explosives and/or incendiaries placed in these buildings prior to 9/11.

31.     A number of architects, engineers, and scientists, including notably the Architects & Engineers for 9/11 Truth nonprofit organization, have made numerous public presentations over the years after the 9/11 Commission Report was issued in 2004 regarding various aspects of the technical evidence that supports the conclusion that pre-placed explosives and/or incendiaries, including nano-thermite or nano-thermate, were used to destroy WTC1, WTC2, and WTC7 on 9/11. Evidence that the collapses of WTC1, WTC2, and WTC7 were due to the use of explosives and/or incendiaries placed in these buildings prior to 9/11 was publicly reported via a

11

variety of sources every year for several years prior to the creation of the FBI's 9/11 Review

Commission.

32.     Notable among this publicly available evidence not assessed by the FBI's 9/11

Review Commission is the following:

32a.     Numerous First Responders reported seeing and hearing explosions at the WTC

on 9/11, including Kenneth Rogers, Firefighter (F.D.N.Y.); Daniel Rivera, Paramedic (E.M.S.);

Stephen Gregory, Assistant Commissioner (F.D.N.Y.); Kevin Gorman, Firefighter; Thomas

Fitzpatrick, Deputy Commissioner for Administration (F.D.N.Y.); Karin Deshore, Captain

(E.M.S.); Dominick Derubbio, Battalion Chief (F.D.N.Y.); Frank Cruthers, Chief (F.D.N.Y.);

Jason Charles, E.M.T. (E.M.S.); Frank Campagna, Firefighter; Ed Cachia, Firefighter; and Rich

Banaciski, Firefighter. Dr. Graeme MacQueen published an article detailing more than 150

examples of WTC witnesses, including over one hundred firefighters, who reported sights or

sounds of explosions on 9/11 which due to the circumstances and timing and specific details

observed and reported could not be explained by plane impacts or resultant office fires. These

above referenced First Responders reports on 9/11 included: "Bombs," "explosions" at the

lowest level and the highest level of the buildings before the collapses, flames being blown out, a

"synchronized deliberate" kind of collapse, like a "professional demolition," "pop, pop, pop,

pop, pop" sounds before the collapses, "low-level flashes," "three floors explode," "the antenna

coming down," like "those implosions on TV," "popping sounds" and "explosions" "going both

up and down and then all around the building," "with each popping" "orange and then a red flash

came out of the building" and "go all around the building," "looked like it was a timed

explosion," "at the very top simultaneously from all four sides, materials shot out horizontally"

before the collapse began, "boom, boom, boom, boom, and then the tower came down," and

"going all the way around like a belt, all these explosions." These consistent specific observations would not all have been mistaken perceptions or false reports given that these reports came from professional First Responders. Such reports cannot be explained by only a gravity-driven collapse caused by plane impacts and office fires.

32b.    Dr. Niels H. Harrit, along with Dr Steven Jones, chemist Kevin Ryan and others, authored one of the key scientific studies ignored by the FBI's 9/11 Review Commission. This article was publicly available since 2009. *See*, Harrit, N.H., Farrer, J., Jones, S., "Active Thermitic Material Discovered in Dust from the 9/11 World Trade Center Catastrophe," The Open Chemical Physics Journal, Vol. 2, pp. 7-31 (2009). According to these highly qualified scientists, WTC dust contained distinctive red/gray colored chips, which when tested, "possess a strikingly similar chemical signature" to "commercial thermite" – a high tech explosive or incendiary (depending on how it is configured). Furthermore, "[i]n addition to the red/gray chips, many small spheres" were found "in the WTC dust" which "contain the same elements as the residue of thermite," The key findings of this analysis included:

i) the "red material . . . contains the ingredients of thermite";

ii) "a high temperature reduction-oxidation reaction has occurred in the heated chips, namely, the thermite reaction"; and

iii) spheroids produced by the tests performed possess a "chemical signature" that "strikingly matches the chemical signature of the spheroids produced by igniting commercial thermite."

iv) This scientific analysis concluded that "the red layer of the red/gray chips . . . discovered in the WTC dust is active, unreacted thermitic material, incorporating nanotechnology, and is a highly energetic pyrotechnic or explosive material."

13

32c.    Expert analysis of seismic data and the resulting conclusion that explosions occurred at WTC1 and WTC2 on 9/11 prior to the airplane impacts on WTC1 and WTC2, as well as prior to the buildings' collapses. Dr. André Rousseau, who has a doctorate degree in geophysics and geology and is a former researcher in geophysics and geology at the National Center for Scientific Research (CNRS) of France and a specialist in acoustic waves, concluded in a peer-reviewed journal article:

> The seismic signals propagating from New York on September 11, 2001, recorded at Palisades (34 km) and published by the Lamont-Doherty Earth Observatory of Columbia University (LDEO), have here been subjected to a new critical study concerning their sources. The aim of this paper is to demonstrate that the nature of the waves, their velocities, frequencies, and magnitudes invalidate the official explanations which imply as sources the percussion of the twin towers by planes and the collapses of the three buildings, WTC1, WTC2 and WTC7.

> First of all, we show the contradictions in the official explanation between the seismic data and the timing of the events. Then we point out that it is strange that identical events (percussions of identical towers on the one hand, and collapses of identical towers on the other hand) at the same location would have generated seismic sources of different magnitudes. We demonstrate that only strong explosives could be the cause of such seismic waves, in accordance with the observed low frequencies.   According to the nature of the recorded waves (body and surface waves), we can propose a location of each explosive source. According to the presence of shear waves or the presence of Rayleigh waves only, we hypothesize a subterranean [below the surface] or a subaerial [on the surface] explosion. … .

> The witnesses and video observation confirm our conclusions of subaerial explosions close to the times of aircraft impacts on WTC1 and WTC2, a strong subterranean explosion closely correlated with the WTC1 collapse, and subaerial explosions closely correlated with the WTC2 and WTC7 collapses, WTC7 not having been hit by a plane. As a consequence, we draw the conclusion that the three buildings were demolished by a controlled process.

>                    *                 *                 *
> For the time of the impact of the plane into WTC1 furnished by the Commission, 8.46.40 (9/11 Commission Report, p. 7; Ritter, 2002), there is a hiatus of 15 seconds between the plausible time of the origin of the Rayleigh wave based on the Palisades data and the time -- afterwards -- of the crash of the plane into

WTC1 based on the ground radar data. What else but an explosion could be the origin for this seismic wave in the absence of an earthquake? A similar discrepancy exists in the data for the seismic wave and impact times for WTC2.

＊          ＊          ＊

The seismic wave data provided by Palisades prove the occurrence of surface waves radiating outward from the World Trade Center. In addition, witnesses reported hearing explosions very close to the times at which planes struck the Towers and when they collapsed (see particularly MacQueen, 2006).

Given these two types of evidence we can affirm that subaerial explosions occurred close to the base of the Towers almost or quite simultaneously with the crashes into the Towers by the planes. The sound coming from these explosions would have been mixed with the sounds generated by the impacts of the planes. The explosion at the base of WTC1 was heard and reported by William Rodriquez (Spingola, 2005).

＊          ＊          ＊

Near the times of the planes' impacts into the Twin Towers and during their collapses, as well as during the collapse of WTC7, seismic waves were generated. To the degree that (1) seismic waves are created only by brief impulses and (2) low frequencies are associated with energy of a magnitude that is comparable to a seismic event, the waves recorded at Palisades and analyzed by LDEO undeniably have an explosive origin. Even if the planes' impacts and the fall of the debris from the Towers onto the ground could have generated seismic waves, their magnitude would have been insufficient to be recorded 34 km away and should have been very similar in the two cases to one another. As we have shown, they were not.

＊          ＊          ＊

We can only conclude that the wave sources were independently detonated explosives ….

＊          ＊          ＊

Finally, controlled demolition of the three towers, suggested by the visual and audio witness testimony as well as by observations of video recordings of their collapses, is thus confirmed and demonstrated by analysis of the seismic waves emitted near the time of the plane impacts and at the moments of the collapses.

This evidence was publicly available since 2012. *See*, "Were Explosives the Source of the Seismic Signals Emitted from New York on September 11, 2001?", Dr. André Rousseau, Journal of 9/11 Studies, Vol. 34, Nov. 2012.

32d.    The presence in all of the WTC dust of tons of previously molten iron-rich metal microspheres, the presence of which have been established by physical laboratory (electron microscope) analysis of WTC dust samples by both U.S. government and independent scientists, is a phenomenon also publicly reported by these scientists, one that would be physically impossible based on the burning of jet fuel and office contents alone, but would be expected if high-tech thermite, thermate, or nano-thermite explosives and/or incendiaries were used which are capable of generating the extreme temperatures required to form these type of microspheres.

32e.    Videos and expert testimony showing near free fall acceleration reached during the collapse of WTC1 and WTC2, and actual free fall acceleration reached during part of the collapse of WTC7 even as these buildings fell through the path of greatest resistance. The federal government's National Institute of Standards and Technology (NIST), after initially denying there was any freefall involved in WTC7's collapse, later admitted that there in fact was a period of freefall during WTC7's collapse.

32f.    Eyewitness testimony and video of the type of squibs associated with controlled demolition occurring during the collapse of three WTC towers on 9/11, including video of molten metal and white smoke characteristic of thermite at the corner of one of the WTC towers immediately prior to collapse initiation.

32g.    Testimony from experts and eye-witnesses which confirm instrument readings of extremely high temperatures exceeding 2,800ºF and fires persisting at Ground Zero for months after 9/11 that cannot be explained by burning jet fuel or building contents but which are

consistent with the presence of thermate, thermite, or nano-thermite. This evidence was publicly

reported and available since 2006. *See*, "Why Indeed Did the WTC Buildings Completely

Collapse?", Dr. Steven E. Jones, Journal of 9/11 Studies, September 2006/Volume 3; "Extremely

high temperatures during the World Trade Center destruction," Steven E. Jones, Kevin Ryan, et

al., Journal of 9/11 Studies, January 2008; and "Environmental anomalies at the World Trade

Center: evidence for energetic materials," Kevin R. Ryan et al., The Environmentalist, March

2009, Volume 29, Issue 1, pp 56–63.

32h.    Photos, physical samples, and eyewitness and expert testimony regarding

sulfidation and corrosion of the WTC steel beams (which was publicly reported in 2002 in the

Federal Emergency Management Agency Building Performance Study, Appendix C), a

phenomenon that cannot be accounted for by a jet fuel fire or gravity-driven collapse but that is

consistent with the use of thermite, thermate, or nano-thermite explosives and/or incendiaries.

32i.    Video and eyewitness testimony of the ejection during the collapse of WTC1 and

WTC2 of heavy steel beams outward from the buildings.

32j.    Advance warnings given to First Responders that WTC7 was about to collapse.

32k.    News accounts, recorded on video, of the collapse of WTC7 <u>before</u> it happened.

32l.    Expert testimony that no steel framed skyscraper had ever completely collapsed

due to fire (or airplane impact) prior to (or on) 9/11.

32m.    The WTC buildings were largely broken into small pieces, with pulverization of

the reinforced concrete occurring, in some cases in mid-air.

32n.    Videos showing largely symmetric straight down collapse of WTC1, WTC2, and

WTC7 despite asymmetric damage. The fact that such a symmetric straight-down collapse

occurred in the case of WTC7 which collapsed into its own footprint, despite asymmetric

damage to WTC7 due to impact from debris falling from the collapsing WTC1, is one of the bases for 3,000 architects and engineers including Architect Gage and Engineer Szamboti concluding that the WTC7 collapse involved the use of pre-placed incendiaries and/or explosives such as thermite and thermate.

32o.    Mainstream television interviews broadcast on September 11th and later recorded statements with WTC1 and WTC2 employees, employees of companies renting office space in WTC1 and WTC2, and other witnesses also document their observations of basement level and lobby explosions. In some of these statements, the witnesses make clear that the explosion in the basement or lobby occurred *before* the plane impacts, which occurred at much higher levels in WTC1 and WTC2. William Rodriguez is one such key witness to WTC pre-plane-impact basement level explosions in WTC1, as is Kenneth Summers and Philip Morelli.   Mr. Rodriguez, who has been widely praised for his heroic efforts to save others on 9/11 also offered to provide to the 9/11 Commission a list of names of several other witnesses to pre-impact explosions at the WTC on 9/11 but the Commission never asked him to provide those witness names (and therefore never considered the testimony and evidence of those witnesses).

33.    A New York City Channel 7 reporter stated: "The ladies who are with me were in the World Trade Center, in the first building [WTC1], and escaped through the lobby. They report what they believe was a bomb in the lobby." One WTC1 lobby witness stated: "And even the turnstile was burnt and was sticking up.   And they just told us to run." A second WTC1 lobby witness stated "And as we were coming out we passed the lobby and there was no lobby, so I believe the bomb hit the lobby first and a couple of seconds and then the first plane hit." Another witness told ABC News on 9/11 that "A fireball emerged from the elevator [in the] lobby and was coming toward me."

18

34.     Another witness told ABC News on 9/11: "I was standing next to One World Trade Center and all of a sudden I heard rumbling and we all started running away from it. The glass like blew out and threw me onto the sidewalk …" A witness told NBC Channel 4: "The bottom elevator, the glass, flames exploded out of the front of the World Trade Center and the glass flew everywhere." A WTC employee, Construction worker Philip Morelli, also reported, in a publicly available video interview, experiencing the pre-plane-impact basement-level explosions first in WTC1 and then also in WTC2. In addition, in interviews prior to his post-9/11 death, the late Barry Jennings stated that he witnessed explosions inside WTC7 on 9/11 while he was trapped in WTC7, before either WTC1 or WTC2 had collapsed.

35.     The above referenced scientific evidence was reported in scientific journals and other reports and documentaries available on the web prior to the establishment of the FBI's 9/11 Review Commission. This evidence was also presented to the public in symposia and public presentations across the country during the several years prior to the establishment of the FBI's 9/11 Review Commission.

36.     Notwithstanding the above facts, and the Congress' and the FBI's charge to the 9/11 Review Commission, the FBI's 9/11 Review Commission failed to address any of the publicly reported evidence that the collapses of WTC1, WTC2, and WTC7 on 9/11 were due to the use of explosives and/or incendiaries that had been pre-placed in the buildings.

37.     Chapter V of the FBI 9/11 Review Commission's Report is the chapter devoted to addressing the charge given the Commission by Congress and the FBI to assess any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001.   In Chapter V, pages 100-107, the FBI's 9/11 Review Commission makes no mention of any of the publicly reported

scientific evidence or First Responder eyewitness reports that the collapses of WTC1, WTC2, and WTC7 on 9/11 were due to the use of pre-placed explosives and incendiaries.

38. The FBI's 9/11 Review Commission concludes on page 101 of its Report that "Based on the available information obtained and considered, the Review Commission concludes that there is no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks." However, had this Commission and the FBI complied with the mandate from Congress and assessed the additional 9/11 related evidence referenced herein, that conclusion would not be supported.

39. Appendix A to the 9/11 Review Commission Report, which includes the list of briefs provided to the FBI's 9/11 Review Commission from the FBI's headquarters divisions, does not include any item referencing the evidence that explosives and/or incendiaries were used to bring down WTC1, WTC2, and WTC7.

40. Appendix B to this 9/11 Review Commission Report, the list of persons interviewed by the FBI's 9/11 Review Commission, includes none of the scientists, architects, engineers, First Responders, or investigators who have publicly reported the above referenced evidence that the collapse of WTC1, WTC2, and WTC7 on 9/11 was due to the use of explosives and/or incendiaries pre-placed in the buildings.

41. Most of the approximately three thousand fatalities from the WTC attacks on 9/11 would have been avoided had the WTC towers not collapsed. Thus, it is clear that evidence of the use of pre-placed explosives and/or incendiaries to bring down the WTC towers on 9/11 would fall within the mandate from Congress and the 9/11 Review Commission's charge from the FBI to assess any evidence now known to the FBI that was not considered by the 9/11

Commission related to any factors that contributed in any manner to the terrorist attacks of

September 11, 2001, including the factor of which parties were responsible for the tragic death

toll on 9/11.

42.     It is also clear, without the need for <u>any</u> logical inference, that FBI officials were

in fact aware of the 9/11 WTC explosive demolition evidence that had been compiled and

publicly presented by Plaintiff nonprofit Architects & Engineers for 9/11 Truth and its founder

Richard Gage. In a December 22, 2008 letter from the FBI to Mr. Harold Saive of Gainesville,

Florida, who had written the FBI to urge the agency to consider the research of Architects &

Engineers for 9/11 Truth and Architect Richard Gage, FBI official Michael J. Heimbach,

Assistant Director, Counterterrorism Division, National Security Branch, assured Mr. Saive that

the FBI's case agents would, in the FBI's on-going investigation of the 9/11 WTC attacks,

undoubtedly review all relevant information before making an unbiased decision, noting that

"Mr. Gage presents an interesting theory backed by thorough research and analysis."

43.     In a later, May 5, 2010, letter from the FBI, this one from the FBI's Laboratory

Director, to Congressman Jim McDermott, FBI Lab Director D. Christian Hassell, Ph.D.

acknowledges that the Congressman's letter on behalf of Mr. Jeff Rische and his colleagues to

the FBI was referred to Lab Director Hassell for response. The FBI's Lab Director notes that the

Congressman's letter included a link to the Architects & Engineers for 9/11 Truth's website

(apparently to a specific article regarding the potential use of nanothermite to destroy certain

WTC buildings on 9/11). While the FBI Lab Director's response to the Congressman is

somewhat dismissive, this letter documents that the FBI was placed on notice of the evidence

developed and articulated by Architects & Engineers for 9/11 Truth regarding the use of pre-

placed explosives and/or incendiaries to destroy three WTC towers on 9/11. While giving the

impression that the FBI had reviewed and analyzed at least one piece of the demolition evidence presented by Architects & Engineers for 9/11 Truth, the FBI Lab Director made no reference to any FBI study, report, lab analysis, or even a back-of-the-envelope assessment of the scientific evidence at issue, and there is no reference in the 2015 FBI 9/11 Review Commission Report to any of this evidence or to the FBI Lab Director's letter.

44.     The FBI 9/11 Review Commission's failure to address the publicly reported evidence that the collapse of WTC1, WTC2, and WTC7 on 9/11 was due to use of explosives and/or incendiaries that had been pre-placed in the buildings, evidence that had not been addressed by the original 9/11 Commission and must have been (and is documented to have been) known to the FBI, was arbitrary and capricious and contrary to law given the mandate given to the FBI by Congress to perform, via the new Commission, an assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001.

45.     The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court other than via the federal mandamus statute 28 U.S.C. § 1361 (addressed in Count I.B. *infra*).

46.     For all the reasons stated herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of demolition of three WTC towers on 9/11 by use of pre-placed explosives and/or incendiaries.

**COUNT I.B.: REQUEST FOR MANDAMUS RELIEF**

47.     All of the foregoing and subsequent paragraphs are incorporated herein by

reference, specifically including the paragraphs in Count I.A..

48.     The actions of Defendants challenged in this Count of the Complaint are final

agency actions for which there is no other adequate remedy in a court, other than via the APA

(addressed in Count I.A. *supra*).

49.     For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the

federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their

non-discretionary duty imposed by Congress requiring Defendants to have prepared an external

independent assessment of any evidence known to the FBI that was not considered by the 9/11

Commission related to any factors that contributed in any manner to the terrorist attacks of

September 11, 2001, specifically in regard to the aforementioned evidence of demolition of three

WTC towers on 9/11 by use of pre-placed explosives and/or incendiaries.


**COUNT II.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER
THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS'
FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT
DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE
FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY
FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST
ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING EVIDENCE
REGARDING THE ARREST AND INVESTIGATION OF THE "HIGH-FIVERS"
OBSERVED AND SELF-PHOTOGRAPHED CELEBRATING THE ATTACKS ON THE
WORLD TRADE CENTER ON 9/11**

50.     This is an action pursuant to the Administrative Procedures Act to compel agency

action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary,

capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be

not in accordance with law; and to hold unlawful and set aside agency action found to be in excess of statutory authority or limitations, or short of statutory right.

51.     All of the foregoing and subsequent paragraphs are incorporated herein by reference.

52.     Another category of evidence related to the 9/11 attacks ignored in the FBI 9/11 Review Commission's Report is the evidence regarding five individuals who were arrested on 9/11 after witnesses reported that at least three individuals in a white van (license number recorded) were seen celebrating and filming the WTC attack early in the morning of September 11, 2001.

53.     The FBI has the names of the five individuals arrested and Plaintiffs' are in possession of several lengthy redacted investigative reports by the FBI regarding the arrest, interrogation and investigation of these individuals.

54.     New Jersey police stopped and arrested these individuals pursuant to a bulletin issued on 9/11 by the FBI regarding the white van, and these individuals were transported by New Jersey State Police to a location where the FBI took custody of these arrestees.

55.     According to the FBI's detailed reports, three individuals were witnessed celebrating (the FBI's term was "high-fiving") and filming the WTC during the terrorist attacks on the morning of 9/11/01 as early as the first aircraft strike at the WTC, prior to the second tower being struck by an aircraft, according to two separate eye-witnesses (and a third witness who observed their van arrive at the apartment building in question at 8:15 am on 9/11). The FBI held and interviewed the five persons arrested for some time (weeks).

56.     These arrestees self-identified as Israelis, who were eventually deported without indictment or prosecution.

57.     One of these individuals arrested has been publicly reported to have made a statement after returning to Israel to the effect that these Israelis were sent to the United States to "document the event" (indicating foreknowledge of 9/11).

58.     One foreign newspaper reported, based on an interview with a family member of one of the arrestees, that these individuals had videotaped the collapse of both WTC towers.

59.     The five specific individuals arrested on 9/11 in this incident were all reported to have worked for a specific moving company at the time, but evidence was obtained by the FBI indicating that the company may not have been a legitimate moving company.

60.     Police and FBI investigations related to the arrest of these individuals on 9/11 are reported to have included, in addition to development of the film confiscated from the arrestees and creation of enlarged prints which showed some of the arrestees smiling as they watched one or both of the WTC towers burning, an explosives residue test on a fabric sample from a blanket found in these individuals' van and swab samples to be tested for explosive residue.

61.     The white van driven by these arrestees was searched by a trained bomb-sniffing dog which yielded a positive result for the presence of explosive traces.

62.     At least one WTC1 visitors' card was found in these arrestees' van. A phone number was also found in the possession of one of the arrestees which corresponded to another moving company that the FBI's Miami office believed had been used by one of the alleged 9/11 hijackers.

63.     One of the arrestees stated to the FBI that one of his coworkers told him on the morning of 9/11 that "they are taking down the second building" and he and a few of his coworkers climbed onto the roof of the company's building to observe the WTC and take

photographs, and at the time he stated he thought the second WTC tower had been demolished intentionally to prevent it from tipping over.

64.     The FBI as part of its investigation compiled the addresses used by the alleged hijackers, the addresses used by suspected associates of the alleged hijackers, and the addresses used by the five arrestees. An FBI report indicates that one or more of these arrestees was possibly connected to a suspect in the WTC terrorist attacks.

65.     The manager of the company that employed the five individuals arrested, whose name is also known by the FBI, apparently fled the country after the arrest of his five employees.

66.     Some of the FBI agents who were involved with the detention and interviews of these "high-fivers" were reported to have drawn the conclusion that these arrestees were in some way involved with the 9/11 terror attacks.

67.     These arrestees were eventually released and deported, apparently against the better judgment of some of the FBI agents involved in the investigation.

68.     The evidence noted above regarding these "high-fivers" was not considered by the original 9/11 Commission, and was not assessed in the later 9/11 Review Commission's Report.

69.     Although all of the above referenced facts and FBI investigative reports regarding these "high-fivers" were (obviously) in the possession of the FBI during the FBI 9/11 Review Commission's work, none of this evidence was assessed by the 9/11 Review Commission or reported to Congress by the 9/11 Review Commission, in violation of the mandate of Congress.

70.     The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court other than via the federal mandamus statute 28 U.S.C. § 1361 (addressed in Count II.B *infra*).

71.     For all the reasons stated herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of the arrest, interrogation, and investigation of the 9/11 "High-Fivers."

**COUNT II.B.: REQUEST FOR MANDAMUS RELIEF**

72.     All of the foregoing and subsequent paragraphs are incorporated herein by reference, specifically including the paragraphs in Count II.A.

73.     The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court, other than via the APA (addressed in Count II.A. *supra*).

74.     For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of the arrest, interrogation, and investigation of the 9/11 "High-Fivers."

**COUNT III.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS' FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING DEFENDANTS' DESTRUCTION OF 9/11 RELATED EVIDENCE RELEVANT AND NECESSARY TO THE 9/11 COMMISSIONS' COMPLIANCE WITH ITS MANDATE FROM CONGRESS**

75.     This is an action pursuant to the Administrative Procedures Act to compel agency action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary, capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be not in accordance with law; and to hold unlawful and set aside agency action found to be in excess of statutory authority or limitations, or short of statutory right.

76.     All of the foregoing and subsequent paragraphs are incorporated herein by reference.

77.     As noted *supra*, the FBI's 9/11 Review Commission was established pursuant to the mandate from Congress in January 2014. *See, e.g*., page 3 of the 9/11 Review Commission Report.

78.     However, Plaintiff Lawyers' Committee received a Freedom of Information Act (FOIA) response from the FBI on February 27, 2018 relating to a previously submitted FOIA request submitted to the FBI for records related to the photographs and film obtained during or as a result of the arrests of the above referenced "high-fivers," and related records. In this FBI FOIA response letter the FBI stated "Records which may have been responsive to your request were destroyed 1/27/2014" (emphasis added).

79.     The FBI's destruction in January of 2014 of these records relevant to the FBI's compliance with the mandate from Congress at the end of the same month in which the 9/11

Review Commission was established by the FBI to comply with the mandate from Congress effectively prevented and obstructed compliance with the mandate from Congress.

80.     The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court other than via the federal mandamus statute 28 U.S.C. § 1361 (addressed in Count III.B. *infra*).

81.     For all the reasons stated herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of destruction of evidentiary records by the FBI that should have been made available to the 9/11 Review Commission and assessed by that Commission and by the FBI in order to comply with the mandate from Congress.


## COUNT III.B.: REQUEST FOR MANDAMUS RELIEF

82.     All of the foregoing and subsequent paragraphs are incorporated herein by reference, specifically including the paragraphs in Count III.A.

83.     The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court, other than via the APA (addressed in Count III.A. *supra*).

84.     For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external

independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of destruction of evidentiary records by the FBI that should have been made available to the 9/11 Review Commission and assessed by that Commission and by the FBI in order to comply with the mandate from Congress.

**COUNT IV.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS' FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING EVIDENCE OF TERRORISM FINANCING AND SAUDI SUPPORT FOR THE 9/11 HIJACKERS**

85.     This is an action pursuant to the Administrative Procedures Act to compel agency action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary, capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be not in accordance with law; and to hold unlawful and set aside agency action found to be in excess of statutory authority or limitations, or short of statutory right.

86.     All of the foregoing and subsequent paragraphs are incorporated herein by reference.

87.     The 9/11 Commission report concluded, including at pages 171-172 of its final report (pages 188-189 of the pdf document), that there was no evidence that the government of Saudi Arabia or Saudi government officials provided any funding for the alleged 9/11 hijackers.

88.     There is, however, on information and belief, evidence known to the FBI by 2014

relating to Saudi financial and other support for the alleged 9/11 hijackers, that was not considered by the 9/11 Commission.

89.     A lawsuit by numerous 9/11 survivors and family members of 9/11 victims, as well as affected businesses and insurance companies, currently pending in the United States District Court in the Southern District of New York (consolidated case No. 03-MDL-1570, example associated case No. 1:02-cv-06977-GBD-SN) has resulted in a court order allowing limited jurisdictional (related to immunity issues) discovery by the plaintiffs regarding Saudi connections to the 9/11 terrorist attacks, including discovery regarding Saudi Arabia's connections to a suspected Saudi intelligence officer, as well as regarding a suspected Saudi consular official, whose alleged ties to hijackers Khalid al-Mihdhar and Nawaf al-Hazmi are referenced in the Twenty-Eight Pages of the Joint Congressional Inquiry. In that case, the plaintiffs allege that Defendant Kingdom of Saudi Arabia bears responsibility for the 9/11 Attacks because its agents and employees directly and knowingly assisted the hijackers and plotters who carried out the attacks. U.S. District Judge George Daniels, in his ruling allowing limited jurisdictional discovery held that: "Neither the 9/11 Commission Report, nor any other governmental report, adequately and specifically refutes Plaintiffs' allegations that [the Saudi intelligence officer] was tasked by [the Saudi consular official] at the behest of a more senior Saudi official, with providing substantial assistance to [alleged 9/11 hijackers] Hazmi and Mihdhar."

90.     This Southern District of New York lawsuit by 9/11 survivors and family members of victims against various Saudi defendants and the court's ruling allowing limited jurisdictional discovery has, on information and belief, also resulted in agreements by the Department of Justice to review three "tranches" of FBI documents for production of non-

privileged documents (either non-classified or to be declassified) to the 9/11 family plaintiffs in that case, documents in the FBI's possession related to the Saudi intelligence officer, the Saudi consular official, and/or Saudi financing and support for the alleged 9/11 hijackers including FBI witness interviews known as "302s." The Lawyers' Committee and the other Plaintiffs herein have not been given access to these FBI documents but based on information and belief Plaintiffs here expect that discovery would show that one or more of these three "tranches" of FBI documents include post-2004 developed FBI evidence that Saudi officials provided material support to some of the alleged 9/11 hijackers, as well as pre-2004 developed FBI evidence of Saudi support for the alleged 9/11 hijackers, some of which evidence documents were source material for the Twenty-Eight Pages of the Joint Congressional Inquiry but on information and belief were not provided to the original 9/11 Commission. If, as expected, some of this FBI evidence in these three "tranches" post-dates the original 9/11 Commission, which closed its work in 2004, then such evidence could not have been provided to or considered by the 9/11 Commission.

91.     A review of the 2015 FBI 9/11 Review Commission Report on its face indicates that the steps taken by the 9/11 Review Commission in doing its work in response to the mandate from Congress did not include reviewing and developing a written assessment of the three "tranches" of FBI documents recently referenced by the DOJ in the lawsuit by the 9/11 family members against the Saudis, and at minimum does not make clear that all the FBI source evidence documents for the Twenty-Eight Pages were assessed by the 9/11 Review Commission (or provided to the original 9/11 Commission). Although the issue of the production of these "tranches" of documents by the DOJ to the 9/11 family member plaintiffs in the New York case is recent, on information and belief these "tranches" of documents, or major portions of them,

have been in the possession of the FBI during the time period relevant to the work of the 9/11

Review Commission (2004-2015), and contain evidence falling within the mandate from

Congress at issue here. As one basis for this conclusion, Dan Christensen of the *Florida Bulldog,*

an investigative news organization, reported, in an article entitled "New FBI document shows

active probe of support network for 9/11 hijackers in 2012" that as late as October 2012, federal

prosecutors and FBI agents in New York City were actively exploring filing charges against a

suspect for providing material support to the 9/11 hijackers and other crimes. The article quotes

former Senator Bob Graham as stating "This has never been disclosed before and it's to the

contrary of almost everything the FBI has produced so far that has indicated that 9/11 is history."

Former Senator Graham, who co-chaired Congress's Joint Inquiry into the terrorist attacks,

added "'It's interesting that it took them 11 years to get there, and a FOIA to get this information

to the public.'" The aforementioned 9/11 related evidence was not assessed in the 9/11 Review

Commission's Report.

92.     There are reasons to believe that one or more of these tranches of FBI documents

contain evidence that post-dates the original 9/11 Commission (and therefore could not have

been considered by that Commission). As one example, a State Department cable released in

2010 by WikiLeaks and reported by Michael Isikoff, national investigative correspondent for

NBC News, in an updated article on February 2, 2011, revived a lingering debate about whether

the 9/11 hijackers may have had a covert "support network" within the United States. The

February 2010 cable, sent from the U.S. Embassy in Qatar to the State Department, asked that

the Department of Homeland Security place a United Arab Emirates citizen, described as being

"currently under investigation" on the terrorism "watch list" because of suspected links to the

9/11 attacks. The cable states that the suspect was being investigated by the FBI because he had

associated with three Qatari men who had flown out of the U.S. on the eve of the attacks after
allegedly spending time casing the World Trade Center and the White House. The cable further
identifies the three Qataris as men who flew to the U.S. on Aug. 15, 2001, and then visited the
World Trade Center, the Statue of Liberty, the White House and various areas in Virginia. The
men flew to Los Angeles on Aug. 24, where their activities raised the suspicion of hotel staff.
Their airline tickets were reported to have been paid for by a convicted terrorist. The cable states
that they paid for their room in cash and requested that it not be cleaned. "Hotel cleaning staff
grew suspicious of the men because they noticed pilot type uniforms, several laptops and several
cardboard boxes" addressed to various countries in the Middle East as well as Afghanistan, it
said. The men also had a smashed cellular phone in the room and computer printouts listing pilot
names, airlines, flight numbers and flight times, according to the cable. Asked specifically about
the Qataris and this suspect, Philip Zelikow, the 9/11 commission's executive director, said in an
email: "In 2004, the commission did not have information reliably linking these people to the
9/11 plot. As best we can remember, we were aware of a lead with some of these elements." A
senior U.S. law enforcement official said that the counterterrorism division of the FBI has
requested that officials responsible for the 9/11 probe review the matter. The 9/11 Review
Commission did not assess the above referenced 9/11 related evidence.

93.     The actions of Defendants challenged in this Count of the Complaint are final
agency actions for which there is no other adequate remedy in a court other than via the federal
mandamus statute 28 U.S.C. § 1361 (addressed in Count IV.B. *infra*). For all the reasons stated
herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to
comply with their non-discretionary duty imposed by Congress requiring Defendants to have
prepared an external independent assessment of any evidence known to the FBI that was not

considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of terrorism financing and provision of support from certain Saudi entities to some of the alleged 9/11 hijackers.

## COUNT IV.B.: REQUEST FOR MANDAMUS RELIEF

94.    All of the foregoing and subsequent paragraphs are incorporated herein by reference, specifically including the paragraphs in Count IV.A.

95.    The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court, other than via the APA (addressed in Count IV.A. *supra*).

96.    For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence of terrorism financing and provision of support from certain Saudi entities to some of the alleged 9/11 hijackers.

**COUNT V.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS' FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING 9/11 PENTAGON AND SURRUNDING AREA VIDEO EVIDENCE.**

97.     This is an action pursuant to the Administrative Procedures Act to compel agency action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary, capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be not in accordance with law; and to hold unlawful and set aside agency action found to be in excess of statutory authority or limitations, or short of statutory right.

98.     All of the foregoing and subsequent paragraphs are incorporated herein by reference, specifically including the paragraphs in Count IV.

99.     The 9/11 Commission did not consider all of the videos obtained by the FBI from, and of, the Pentagon and surrounding area on 9/11, including but not limited to videotape(s) from the Sheraton Hotel security camera(s) overlooking the Pentagon. 9/11 Pentagon and surrounding area video evidence was also not assessed in the FBI 9/11 Review Commission's Report.

100.     On 9/11, the Pentagon had numerous security cameras in place monitoring various sides, portions, doors, access points and other areas of the Pentagon, and the FBI had a large presence at the Pentagon collecting evidence including at least some videos. This is made clear in the oral history interview of Brian Austin and Steve Pennington by Diane Putney for the Historical Office of the Secretary of Defense on November 9, 2006.

101.     In a 2018 Freedom of Information Act request response from the FBI to Eugene

F. Laratonda III, the FBI disclosed that it had in the possession of the FBI at least 13 compact

discs (CDs) containing video files, and 100 or more videos, that fell into Mr. Laratonda's request

for all video from September 11, 2001 within a one mile radius of the Pentagon.

102.     The actions of Defendants challenged in this Count of the Complaint are final

agency actions for which there is no other adequate remedy in a court, other than via the federal

mandamus statute 28 U.S.C. § 1361 (addressed in Count V.B. *infra*). For all the reasons stated

herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to

comply with their non-discretionary duty imposed by Congress requiring Defendants to have

prepared an external independent assessment of any evidence known to the FBI that was not

considered by the 9/11 Commission related to any factors that contributed in any manner to the

terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence

related to 9/11 Pentagon and surrounding area videos.


**COUNT V.B.: REQUEST FOR MANDAMUS RELIEF**

103.     All of the foregoing and subsequent paragraphs are incorporated herein by

reference, specifically including the paragraphs in Count V.A.

104.     The actions of Defendants challenged in this Count of the Complaint are final

agency actions for which there is no other adequate remedy in a court, other than via the APA

(addressed in Count V.A. *supra*).

105.     For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the

federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their

non-discretionary duty imposed by Congress requiring Defendants to have prepared an external

independent assessment of any evidence known to the FBI that was not considered by the 9/11

Commission related to any factors that contributed in any manner to the terrorist attacks of

September 11, 2001, specifically in regard to the aforementioned evidence related to 9/11

Pentagon and surrounding area videos.


**COUNT VI.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS' FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING 9/11 RELATED RECOVERED AIRCRAFT PARTS, WRECKAGE, AND PARTS' SERIAL NUMBER EVIDENCE.**

106.    This is an action pursuant to the Administrative Procedures Act to compel agency

action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary,

capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be

not in accordance with law; and to hold unlawful and set aside agency action found to be in

excess of statutory authority or limitations, or short of statutory right.

107.    All of the foregoing and subsequent paragraphs are incorporated herein by

reference, specifically including the paragraphs in Count IV.

108.    Publicly available photographs taken at the three 9/11 attack/crash sites show FBI

personnel systematically engaged in collection of evidence at each crime scene. One of the first

priorities of the FBI's Evidence Recovery Teams on 9/11 at each of these sites was to find and

collect all airplane parts and other visible evidence on the ground or otherwise present at each of

these sites (for example, in trees). The FBI and other federal agencies and entities have reported

that various plane parts were observed at some of these sites on 9/11 including one or more

landing gear parts, one or more jet engine parts, and one or more aircraft seats or portions thereof.

109.    The 9/11 Commission did not consider the FBI's records and other FBI evidence referencing or reflecting the aircraft parts' serial numbers on, or other features of, plane parts and wreckage recovered from any of the three 9/11 attack/crash sites (WTC, Pentagon, and Shanksville). The FBI's evidence related to the serial numbers on, or other features of, plane parts and wreckage recovered from any of the three 9/11 attack/crash sites (WTC, Pentagon, and Shanksville) was also not assessed in the FBI 9/11 Review Commission's Report.

110.    The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court, other than via the federal mandamus statute 28 U.S.C. § 1361 (addressed in Count VI.B. *infra*).

111.    For all the reasons stated herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence related to recovered aircraft parts and wreckage from the 9/11 attack/crash sites.


**COUNT VI.B.: REQUEST FOR MANDAMUS RELIEF**

112.    All of the foregoing and subsequent paragraphs are incorporated herein by reference, specifically including the paragraphs in Count VI.A.

113.    The actions of Defendants challenged in this Count of the Complaint are final

agency actions for which there is no other adequate remedy in a court, other than via the APA

(addressed in Count VI.A. *supra*).

114.    For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the

federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their

non-discretionary duty imposed by Congress requiring Defendants to have prepared an external

independent assessment of any evidence known to the FBI that was not considered by the 9/11

Commission related to any factors that contributed in any manner to the terrorist attacks of

September 11, 2001, specifically in regard to the aforementioned evidence related to recovered

aircraft parts and wreckage from the 9/11 attack/crash sites.


**COUNT VII.A.: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT RELATING TO DEFENDANTS' FAILURE TO COMPLY WITH THE MANDATE FROM CONGRESS THAT DEFENDANTS PERFORM AN ASSESSMENT OF ANY EVIDENCE KNOWN TO THE FBI THAT WAS NOT CONSIDERED BY THE 9/11 COMMISSION RELATED TO ANY FACTORS THAT CONTRIBUTED IN ANY MANNER TO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, SPECIFICALLY REGARDING 9/11 CELL PHONE AND AIR (SEAT BACK) PHONE CALLS EVIDENCE.**

115.    This is an action pursuant to the Administrative Procedures Act to compel agency

action unlawfully withheld; to hold unlawful and set aside agency action found to be arbitrary,

capricious, and an abuse of discretion; to hold unlawful and set aside agency action found to be

not in accordance with law; and to hold unlawful and set aside agency action found to be in

excess of statutory authority or limitations, or short of statutory right.

116.    All of the foregoing and subsequent paragraphs are incorporated herein by

reference, specifically including the paragraphs in Count IV.

117.    The 9/11 Commission did not consider all of the FBI's records and other FBI evidence regarding cell phone and air (seat back) phone calls made, attempted to be made, or not made from the four aircraft that the FBI and 9/11 Commission reported as hijacked on 9/11 and subsequently crashed at the WTC, at the Pentagon, and near Shanksville, Pennsylvania.

118.    The FBI's evidence related to cell phone and air (seat back) phone calls made, attempted to be made, or not made from the four aircraft that the FBI and 9/11 Commission reported as hijacked on 9/11 and subsequently crashed at the WTC, at the Pentagon, and near Shanksville, Pennsylvania that was not considered by the original 9/11 Commission was also not assessed in the FBI 9/11 Review Commission's Report.

119.    As an example of such unconsidered and unassessed evidence regarding phone calls made or reported as having been made on 9/11 from the hijacked aircraft, the original 9/11 Commission treated the FBI's records regarding phone calls made from the 9/11 hijacked planes as having included four completed calls to then-Solicitor General Ted Olson from his wife Barbara Olson who was a passenger on 9/11 Flight 77 that is reported to have struck the Pentagon. Each of these four calls were, from the face of the 9/11 Commission Report, believed by the members of the original 9/11 Commission, based on records provided to that Commission at that time, to have lasted between one and one-half to over four minutes. See, e.g., the original 9/11 Commission Report at Notes 57, 80-81 for Chapter One. Solicitor General Olson publicly reported the details of what his wife told him regarding the real-time hijacking of her airplane during these calls. The FBI later, however, in the 2006 Moussaoui 9/11 terrorism trial, presented evidence to the court indicating that there was only one call from Barbara Olson on 9/11 and it was not connected (zero seconds in duration). The FBI evidence presented in the Moussaoui trial regarding the phone calls reported from Todd Beamer on Flight 93 on 9/11 in terms of

41

frequency, times and duration is inconsistent with, *inter alia*, the original 9/11 Commission's conclusions regarding when that flight was hijacked and when it crashed. Thus, the FBI has evidence regarding 9/11 calls from hijacked airplanes that the original 9/11 Commission did not consider, and which the later 9/11 Review Commission did not assess.

120.    The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court, other than via the federal mandamus statute 28 U.S.C. § 1361 (addressed in Count VII.B. *infra*). For all the reasons stated herein, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' failure to comply with their non-discretionary duty imposed by Congress requiring Defendants to have prepared an external independent assessment of any evidence known to the FBI that was not considered by the 9/11 Commission related to any factors that contributed in any manner to the terrorist attacks of September 11, 2001, specifically in regard to the aforementioned evidence related to cell phone and air (seat back) phone calls made, attempted to be made, or not made, from the four aircraft that the FBI and 9/11 Commission reported as hijacked on 9/11 and subsequently crashed at the WTC, at the Pentagon, and near Shanksville, Pennsylvania.


**COUNT VII.B.: REQUEST FOR MANDAMUS RELIEF**

121.    All of the foregoing and subsequent paragraphs are incorporated herein by reference, specifically including the paragraphs in Count VII.A.

122.    The actions of Defendants challenged in this Count of the Complaint are final agency actions for which there is no other adequate remedy in a court, other than via the APA (addressed in Count VII.A. *supra*).

123.    For all the reasons stated herein, Plaintiffs are entitled to injunctive relief via the

federal mandamus statute 28 U.S.C. § 1361 to remedy Defendants' failure to comply with their

non-discretionary duty imposed by Congress requiring Defendants to have prepared an external

independent assessment of any evidence known to the FBI that was not considered by the 9/11

Commission related to any factors that contributed in any manner to the terrorist attacks of

September 11, 2001, specifically in regard to the aforementioned evidence related to cell phone

and air (seat back) phone calls made, attempted to be made, or not made, from the four aircraft

that the FBI and 9/11 Commission reported as hijacked on 9/11 and subsequently crashed at the

WTC, at the Pentagon, and near Shanksville, Pennsylvania.

**PRAYER FOR RELIEF**

124.    WHEREFORE, Plaintiffs respectfully request this Court to:

(A) Order Defendants to comply with the mandate of Congress by 1) Undertaking a new

thorough external independent assessment of any evidence known to the FBI that was not

considered by the 9/11 Commission related to any factors that contributed in any manner to the

terrorist attacks of September 11, 2001, including but not limited to all evidence known to the

FBI that falls within each of the categories of evidence described in Counts I-VII herein,

including the evidence referenced and/or submitted by Plaintiffs and 2) Submitting such

assessment in a public report to Congress;

(B) Order Defendants to make good faith efforts and every reasonable effort to recover,

or if necessary to reconstruct, the records destroyed in January 2014 referenced in Count III.A.

herein that should have been subjected to the external review mandated by Congress to assess

any evidence known to the FBI that was not considered by the 9/11 Commission related to any

factors that contributed in any manner to the terrorist attacks of September 11, 2001, and assess

such evidence and include such recovered and/or reconstructed evidence in the public report to

Congress;

(C) Award to Plaintiffs and against Defendants Plaintiff's costs and reasonable attorneys'

fees in this action; and

(D) Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted


/s/ Mick G. Harrison
Mick G. Harrison, Esq. (Admission pending)
Pennsylvania Attorney # 65002
U.S. Court of Appeals for the D.C. Circuit # 55038
520 S. Walnut Street, #1147
Bloomington, IN    47402
Tel. 812.361.6220
Fax: 812.233.3135
E-mail: mickharrisonesq@gmail.com


/s/John M. Clifford
John M. Clifford, #191866
Clifford & Garde, LLP
1850 M St., NW, Suite 1060
Washington, D.C. 20036
Tel. 202.280.6115
E-mail: jclifford@cliffordgarde.com

Counsel for Plaintiffs

Dated: March 25, 2019