| | |
|---|---|
| **THE LAWYERS' COMMITTEE FOR 9/11 INQUIRY, INC.**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **CHRISTOPHER A. WRAY,** *et al.*, <br><br> Defendants. | Case No. 1:19-cv-00824 (TNM) |

# MEMORANDUM OPINION

Two organizations and one individual seek an order requiring the FBI to evaluate and report on certain evidence related to the terrorist attacks of September 11, 2001. In their view, Congress directed the FBI to report on evidence that the 9/11 Commission did not consider. They believe the FBI violated this mandate. The Government moves to dismiss for lack of standing and on other grounds. The Court agrees that Plaintiffs lack standing, so the Court will grant the Government's motion and dismiss the case.

**I.**

In 2002, Congress established the National Commission on Terrorist Attacks Upon the United States ("National 9/11 Commission"). First Am. Compl. ¶ 3, ECF No. 11. That Commission concluded that Osama bin Laden and other Islamic extremists were responsible for the attacks.[1] Plaintiffs find this conclusion wanting. They believe, for example, that "pre-

---

[1] *Final Report of the National Commission on Terrorist Attacks Upon the United States, Executive Summary* 3 (July 22, 2004), https://govinfo.library.unt.edu/911/report/911Report_Exec.pdf.

placed" explosives caused the World Trade Center buildings to collapse. *Id.* ¶¶ 11, 33. They also suspect "malfeasance" on the part of the United States government. *Id.* ¶ 15.

One plaintiff is the Lawyers' Committee for 9/11 Inquiry ("Lawyers' Committee"). *Id.* ¶ 10. Its mission is "to promote transparency and accountability" about the events of September 11. *Id.* It believes that family members of the victims have a right to know the "full truth" of what happened that day. *Id.* Another plaintiff is the Architects & Engineers for 9/11 Truth ("Architects"). *Id.* ¶ 13. It seeks to educate the public about the "true reasons" for the collapse of the World Trade Center buildings. *Id.* The final plaintiff is Robert McIlvaine. *Id.* ¶ 15. He is the father of Bobby McIlvaine, a victim of the attack on the World Trade Center. *Id.*

The relevant legal background starts with the National 9/11 Commission's 2004 report. Besides assigning responsibility for the attacks, it made recommendations to the FBI and other agencies on how to prevent future attacks.[2] Nine years later, Congress allotted $500,000 "for a comprehensive review of the implementation of the recommendations related to the [FBI] that were proposed in the report issued by the [National 9/11 Commission]." Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. No. 113-6, 127 Stat. 198, 247 (2013). Plaintiffs believe that this provision "imposed a mandatory duty" on the FBI to assess and report on evidence that the National 9/11 Commission did not consider. First Am. Compl. ¶ 7.

In response to this legislation, the FBI Director formed a body called the 9/11 Review Commission. *See* Mot. to Dismiss Ex. 1 at 5 & n.1,[3] ECF No. 12-2. It released its own report in 2015. *Id.* at 2. One chapter of that report discussed some evidence that the National 9/11 Commission did not consider. *Id.* at 102. But it ultimately concluded that "no new information

---

2    *Executive Summary*, *supra* note 1, at 16–26.
3    All page citations are to the page numbers that the CM/ECF system generates.

obtained since the . . . 2004 report would change the [National 9/11 Commission's] findings regarding responsibilities for the 9/11 attacks." *Id.* at 109.

Plaintiffs allege that the Review Commission failed to "fully comply" with the 2013 appropriations act. First Am. Compl. ¶ 7. They acknowledge that the Review Commission investigated some new evidence. *Id.* ¶ 28. But they complain it "failed to assess and report to Congress, as mandated, several other categories of significant 9/11 related evidence known to the FBI." *Id.* ¶ 29. For Plaintiffs, full compliance means that the FBI must report on the seven categories of evidence that they list in their causes of action. *Id.* ¶ 127. These categories include evidence "related to use of pre-placed explosives" (Count I) and "evidence regarding the arrest and investigation of the 'high-fivers' observed and self-photographed celebrating the attacks" (Count II). *Id.* at 11, 24. Plaintiffs bring their claims under the Administrative Procedure Act and the mandamus statute, 28 U.S.C. § 1361. *Id.* ¶ 1.

## II.

Article III of the Constitution limits the jurisdiction of federal courts to "actual cases or controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). One component of the case-or-controversy requirement is standing to sue. *Id.* A plaintiff bears the burden of showing that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* At the pleading stage, the plaintiff "must clearly allege facts demonstrating each element." *Id.* (cleaned up). Courts grant plaintiffs the benefit of all reasonable inferences from the allegations, but they will not accept inferences that the facts do not support. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

This case involves informational standing and organizational standing. The foundational case for informational standing is *FEC v. Akins*, 524 U.S. 11 (1998). The Supreme Court explained that a plaintiff suffers injury in fact when he "fails to obtain information which must be publicly disclosed pursuant to a statute." *Id.* at 21. The statute must "seek to protect [plaintiffs] from the kind of harm they say they have suffered." *Id.* at 22.

An organization can assert standing on its *own* behalf or on behalf of its *members*. *EPIC v. U.S. Dep't of Commerce*, 928 F.3d 95, 100 (D.C. Cir. 2019). The former is "organizational standing" and the latter is "associational standing." *Id.* An entity asserting organizational standing, like an individual plaintiff, must show that *it* has suffered injury traceable to the defendant and redressable by a favorable judicial decision. *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

The Government moves to dismiss the First Amended Complaint based on lack of standing and failure to state a claim. *See* Mot. to Dismiss at 1–2, ECF No. 12. This motion is ripe. Lack of standing is a basis for dismissal under Federal Rule of Civil Procedure 12(b)(1). *Commonwealth v. U.S. Dep't of Educ.*, 340 F. Supp. 3d 7, 18 (D.D.C. 2018). If dismissal is proper under Rule 12(b)(1), the Court cannot resolve the alternative arguments for dismissal under Rule 12(b)(6). *Id.* at 18 & n.3.

### III.

Plaintiffs contend that they all have informational standing and that the Lawyers' Committee and Architects have organizational standing. Pls.' Opp'n to Mot. to Dismiss ("Opp'n") at 13, ECF No. 13. Neither organization claims associational standing. *See id.* at 13, 18–25. The Court finds that Plaintiffs have not suffered an informational injury and that their

theories of organizational standing also fail. Plaintiffs thus lack standing to bring their claims and the proper disposition is dismissal under Rule 12(b)(1).

A.

Consider first informational standing. Citing *Akins*, 524 U.S. at 21–22, the D.C. Circuit has distilled "informational injury" into a two-part test. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). A plaintiff must allege that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.*

As in *Friends of Animals*, Plaintiffs' claim of informational injury "fails at the first part of the inquiry." *Id.* They seek to enforce appropriations legislation that does not require the FBI to disclose information to them or anyone else. Recall the statutory text at issue: "$500,000 shall be for a comprehensive review of the implementation of the recommendations related to the [FBI] that were proposed in the report issued by the [National 9/11 Commission]." Pub. L. No. 113-6, 127 Stat. at 247. This is an appropriations provision, not a disclosure law. And Congress did not allocate funds for a comprehensive *report*. It allocated funds for a "comprehensive *review*." *Id.* (emphasis added).

Indeed, the parties agree that the *text* of this provision does not require the disclosure of information. *See* Opp'n at 9. Plaintiffs instead focus on an "explanatory statement" that a Senator entered into the record two weeks before Congress passed the appropriations act. *See id.* at 8–11, 15. This statement asserts that the scope of the FBI's review "shall include . . . an assessment of any evidence now known to the FBI that was not considered by the [National Commission] related to any factors that contributed in any manner to the terrorist attacks of

5

September 11, 2001." 159 Cong. Rec. S1305 (Mar. 11, 2013). It then says that the FBI "shall submit a report to the Committees . . . on the findings and recommendations resulting from this review." *Id.* A provision in the appropriations law declares that this explanatory statement "shall have the same effect with respect to the allocation of funds and implementation of this Act as if it were a joint explanatory statement of a committee of conference." Pub. L. No. 113-6, 127 Stat. at 199. But Congress does not vote on a joint explanatory statement, so it "has no force of law" and functions as legislative history. *See Goldring v. District of Columbia*, 416 F.3d 70, 75 & n.3 (D.C. Cir. 2005).

Still, Plaintiffs go all in with the explanatory statement. They point to a line of D.C. Circuit decisions opining that "pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." *NRDC v. Browner*, 57 F.3d 1122, 1227 (D.C. Cir. 1995) (cleaned up). In their view, the explanatory statement here is "authoritative" evidence of congressional intent. *See* Opp'n at 9. Arguing from this premise, they insist the provision allocating $500,000 to the FBI for a "review" is really a requirement that the FBI issue a report. *See id.* at 9–11, 15. Not so.

This reading impermissibly elevates legislative history over unambiguous statutory text. "Whether or not legislative history is ever relevant, it need not be consulted when, as here, the statutory text is unambiguous." *United States v. Woods*, 571 U.S. 31, 46 n.5 (2013). Insofar as decisions like *Browner* suggest the opposite, they are overtaken by *Woods* and other more recent cases. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630–31 (2018) (rejecting the dissent's reliance on legislative history, since the statutory text was unambiguous); *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 350 (D.C. Cir. 2019) ("[W]hen the statutory text is clear, legislative history should not be used to muddy its meaning."). Gone are the "bacchanalian

days" when courts idolized legislative history. *See EPIC v. NSCAI*, --- F.Supp. 3d ---, ---, No. 19-cv-2906, 2019 WL 6498868, at *5 (D.D.C. Dec. 3, 2019). Plaintiffs point to nothing in the language or structure of the appropriations act suggesting ambiguity on whether the allocation of $500,000 to the FBI is really a disclosure requirement. *See* Opp'n at 9–10.

*Goldring* is instructive. The question there was the meaning of a fee-shifting provision in the Individuals with Disabilities Education Act. 416 F.3d at 71. The D.C. Circuit concluded that the phrase "reasonable attorneys' fees as part of the costs" unambiguously did *not* encompass expert fees. *See id.* at 74. As the appellant noted, however, a joint explanatory statement was to the contrary: "The conferees intend that the term 'attorney's fees as part of the costs' include reasonable expenses and fees of expert witnesses[.]" *Id.* at 74, 75 n.3. The court found that recourse to this explanatory statement was "unwarranted." *Id.* at 74. It noted the line from *Browner* about how legislative history can shed light on congressional intent, despite statutory language that appears "superficially clear." *Id.* But the statutory text at issue was "clear, not just superficially so." *Id.* That the legislative history cut in the opposite direction from the statutory text only made it the "paradigmatic" case in which the latter should trump the former. *See id.* at 75. So too here. Even if some legislators wanted the FBI to issue a report—and to disclose information in doing so—the legislature enacted no disclosure requirement.

To be sure, the FBI took the explanatory statement seriously. As Plaintiffs point out, the 9/11 Review Commission did in fact issue a report in response to the 2013 appropriations act. *See* Opp'n at 10–11. The report opined that Congress had "required" the FBI to produce it. Mot. to Dismiss Ex. 1 at 5. It is hardly surprising that the FBI heeded the stated desire of its appropriators. That does not mean the FBI was legally required to do so, though. In any event, the FBI's interpretation of the law is not controlling. An agency "does not have the authority to

7

create a statutory obligation where Congress has not done so." *SourceAmerica v. U.S. Dep't of Educ.*, No. 17-cv-893, 2018 WL 1453242, at *10 n.15 (E.D. Va. Mar. 23, 2018); *cf. Smith v. Berryhill*, 139 S. Ct. 1765, 1775 (2019) (distinguishing "agency grace" from "legislative right").

Because the appropriations provision "does not itself mandate the disclosure of any information," Plaintiffs have not suffered an informational injury. *Friends of Animals*, 828 F.3d at 990. The D.C. Circuit's framing does seem permissive—the question is whether a plaintiff "has been deprived of information that, *on its interpretation*, a statute requires the government or a third party to disclose to it." *Id.* at 992 (emphasis added). Even so, the case law does not require the Court to ignore the plain terms of a statute, even at the pleading stage.

*Friends of Animals* illustrates this point. The D.C. Circuit affirmed dismissal of the complaint because the plaintiff failed to establish informational injury. *Id.* at 990. The plaintiff was "seeking to enforce a statutory *deadline* provision that *by its terms* does not require the public disclosure of information." *Id.* at 992 (emphasis added). That deadline provision contrasted with a disclosure provision in the same law, but the plaintiff was not seeking to enforce the disclosure provision. *Id.* at 994. The law here is of a piece. By its terms, it does not require the disclosure of any information. That is so, of course, because it is an appropriations provision.

Plaintiffs raise a couple additional points on this subject. *First*, Plaintiffs discuss the Journal Clause of the Constitution, art. I, § 5, cl. 3. Opp'n at 15–16. This digression concerns their attempt to satisfy—in part—the first step under *Friends of Animals*. A plaintiff must establish that a statute requires the disclosure of information "to it." 828 F.3d at 992. Plaintiffs believe the Journal Clause requires that any information the FBI reports to Congress will enter the public domain, ensuring disclosure to them. *See* Opp'n at 15–16. Whatever the merits of

8

this argument in general, the Journal Clause's role is immaterial here. The appropriations provision does not require disclosure of information to anyone or anything, including Congress.

*Second*, each Plaintiff claims a "special interest" in the FBI's disclosure of information. *See id.* at 13–14, 19–20. The Lawyers' Committee says that a "public evaluation and report to Congress . . . regarding the 9/11 related evidence" would advance its "primary goals" of "transparency and accountability regarding the tragic events." *Id.* at 14. The Architects similarly assert that the desired report would promote its goal of educating the public about the "true reasons" for the collapse of the Word Trade Center buildings. *Id.* And McIlvaine has an interest in emotional closure. *Id.* at 20. These interests, however, go to the second part of the *Friends of Animals* test—whether a plaintiff "suffers . . . the type of harm that Congress sought to prevent by requiring disclosure." 828 F.3d at 992. For example, if Congress had required the FBI to report on new evidence, perhaps the goal would have been to mitigate the suffering of survivors like McIlvaine. But Congress did not require the disclosure of any information, so Plaintiffs cannot show informational injury.[4] *Id.* at 990.

**B.**

The Lawyers' Committee and Architects also assert organizational standing. *See* Opp'n at 17–24. The Court is dubious that their alleged organizational injuries are distinct from their

---

[4] The Government makes essentially the same argument as an alternative basis for dismissal under Rule 12(b)(6). It contends that Plaintiffs lack a cause of action because the appropriations provision imposes no duty on the FBI to issue a report or disclose any information. *See* Mem. in Supp. of Mot. to Dismiss at 13–14, ECF No. 12-1 (citing *SourceAmerica*, No. 17-cv-893, 2018 WL 1453242, at *10); Reply in Supp. of Mot. to Dismiss at 3–6, ECF No. 14. As it happens, this rationale is fatal to Plaintiffs' theory of informational standing. And to their theories of organizational standing fail as well. *See infra* Section III.B. Since dismissal is proper under Rule 12(b)(1), the Court does not resolve the alternative bases for dismissal under Rule 12(b)(6). *See Commonwealth*, 340 F. Supp. 3d at 18 & n.3.

alleged informational injury. But their theories of organizational standing fail for other reasons anyway.

The groups advance three theories of organizational standing. *First*, they claim to have a "financial interest at stake" because they applied for a State Department reward. *Id.* at 18. They believe the State Department would likely give them a reward if the FBI reports on all the new evidence. *Id. Second*, they assert that the FBI's inaction has forced them "to expend resources beyond those normally expended (and beyond the instant litigation)." *Id.* at 21. And *third*, they suggest that DOJ "fund[s] local and state terrorism programs that attempt to discredit" them. *Id.* at 23. If the FBI reports on the new evidence, DOJ's efforts "to defame" the two organizations "could be effectively countered." *Id.* at 24.

All these theories allege harms that *stem from the FBI's failure to disclose the desired information*. To the Court's eye, then, they are part and parcel of the alleged informational injury. Since the organizations have suffered no informational injury as explained above, the alternative theories also fail.

Consider a similar case the D.C. Circuit decided two years ago. *See EPIC v. President'l Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017). EPIC, an advocacy organization, challenged the government's "failure to produce a privacy impact assessment" under section 208 of the E-Government Act. *Id.* at 377. EPIC advanced theories of informational injury and organizational injury. *Id.* The court rejected both theories "without necessarily agreeing that they are in fact analytically separate here." *Id.* Indeed, the court observed that EPIC "identifie[d] no organizational harm unrelated to its alleged informational injury." *Id.* at 377–78.

EPIC failed to establish an informational interest because it did not suffer the type of harm that section 208 of the E-Government Act sought to prevent. *Id.* at 378. The purpose of that section was to protect the privacy of individual voters, not the ability of nonprofits to ensure transparency. *Id.* EPIC's "sole theory of organizational injury," meanwhile, was that the "failure to produce a privacy impact assessment injures its interest in using the information contained in the assessment to focus public attention on emerging privacy and civil liberties issues." *Id.* at 378–79 (cleaned up). In rejecting this theory, the court reiterated that "section 208 . . . does not confer any such informational interest on EPIC." *Id.* at 379. EPIC thus could not "ground organizational injury on a non-existent interest." *Id.*

So too here. Plaintiffs' theory of organizational injury is that the FBI's failure to disclose certain information—*i.e.*, a report on seven categories of evidence—injures their interest in (1) using that information to claim a reward, (2) using that information to save resources, and (3) using that information to counter alleged defamation. But the appropriations provision does not give Plaintiffs any interest in this information. *See supra* Section III.A. They "cannot ground organizational injury on a non-existent interest." *EPIC*, 878 F.3d at 379.

Of course, organizations will sometimes assert harms separate from informational ones. *See id.* at 381 (Williams, J., concurring). Judge Williams agreed that EPIC asserted no organizational harms unrelated to its alleged informational injury. *Id.* at 380. He helpfully contrasted this situation with one in which the court analyzed the two theories separately (appropriately, in his view). *See Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13 (D.C. Cir. 2011). A look at *Feld* helps crystallize why Plaintiffs' claim of organizational injury is inseparable from its claim of informational injury.

11

In *Feld*, the Animal Protection Institute ("API") complained about a circus group's techniques for controlling its elephants. *Id.* at 17. API's theory of informational injury was that the group's failure to seek a permit for its activity deprived it of information "to which it would be entitled in the course of a permit proceeding." *Id.* at 19. Its theory of organizational injury, meanwhile, was that "it had to expend resources to combat [the group's] treatment of elephants." *Id.* at 19, 26. So the organizational injury had nothing to do with the informational injury. API expended resources because of the circus group's alleged mistreatment of elephants, not because anyone had deprived it of information. Here, the two organizations claim to have suffered financial and reputational harms *because the FBI has deprived them of information*—information in which they have no interest. The viability of these other alleged harms thus depends on the existence of an informational harm. *See EPIC*, 878 F.3d at 379.

In any event, the theories of organizational standing fail for other reasons. First up is the application for the State Department reward. Plaintiffs submitted this application four days before they filed an amended complaint. First Am. Compl. ¶ 11. The Secretary of State, in consultation with the Attorney General, may pay a reward to individuals who provide information that leads to the arrest or conviction of terrorists. *See* 22 U.S.C. § 2708(a)(3), (b). In their application, Plaintiffs submitted evidence "that three WTC buildings were destroyed by use of explosives and incendiaries on 9/11." First Am. Compl. ¶ 11. As Plaintiffs see it, the reward application confers standing because it gives them a "financial interest" in the outcome of this lawsuit. Opp'n at 18. They rely on a case where a court mused—in *dictum*—that "a person who would be entitled to a bounty if a prosecution were initiated might well have standing." *Sargeant v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997).

This theory of standing fails at the redressability prong. Two principles are relevant here. It must be likely, as opposed to merely speculative, that a favorable decision will provide redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And courts do not lightly speculate on how "independent actors" not before them might exercise their broad discretion. *See id.* at 562. It is wildly speculative that a court order directing the FBI to report on Plaintiffs' seven categories of evidence would allow them to claim a reward. Setting aside the chances that this report would lead to the arrest or conviction of a terrorist, just consider how much leeway the Secretary of State has. The decision to pay a reward lies in his "sole discretion." 22 U.S.C. § 2708(b). And this decision "shall not be subject to judicial review." *Id.* § 2708(j); *see Heard v. U.S. Dep't of State*, No. 08-02123, 2010 WL 3700184, at *4 (D.D.C. Sept. 17, 2010). So the Secretary is an independent actor who exercises broad discretion unreviewable by this Court or *any* court.

Apart from being *dictum*, *Sargeant*'s "bounty" theory of standing is distinguishable. The idea was that a plaintiff might have standing to force a prosecution under 18 U.S.C. § 3332 if the initiation of that prosecution would entitle him to a reward. *See* 130 F.3d at 1070. Plaintiffs do not seek a court order directing DOJ to prosecute anyone. They want this Court to order the FBI to report on seven categories of evidence, and they hope that this report would trigger the prosecution of one or more terrorists. Opp'n at 18. This is a step too far (at a minimum).

Next up is the expenditure of resources. The Lawyers' Committee and Architects apparently devoted substantial resources to the State Department reward application. *Id.* at 22. And before filing the application, they spent "thousands of dollars" on "an extensive formal Petition to the U.S. Attorney for the Southern District of New York." *Id.* at 21–22. The purpose of this Petition was to have "evidence of controlled demolition at the WTC on 9/11 presented to a special grand jury." *Id.* at 22. The U.S. Attorney has not acted on this Petition, so the

13

Lawyers' Committee filed "a mandamus action and request for disclosure of grand jury records." *Id.* It has also "expended significant time and funds" litigating cases under the Freedom of Information Act that seek agency studies of how the World Trade Center buildings collapsed. *Id.* at 22–23. The Architects, meanwhile, incurred "substantial expense" funding their own engineering study. *Id.* at 22.

The Court doubts that any of these expenditures suffice to confer standing. "[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Some expenditures likely fall under the "litigation" exceptions. And the point of all these projects seems to be "advocacy"—shedding light on what these organizations believe were the true causes of the September 11 attacks.

More, Plaintiffs failed to plead enough facts to support an injury stemming from expenditure of resources. The First Amended Complaint mentioned their "application for a reward with the U.S. State Department." First Am. Compl. ¶ 11. This application, they noted, included evidence "previously submitted to the U.S. Attorney for the Southern District of New York." *Id.* That was it. There was no hint that Plaintiffs had expended substantial resources on these projects. That allegation came later, in the opposition brief. *See* Opp'n at 21–22. And there was nothing at all in the First Amended Complaint about the mandamus litigation in New York, the engineering study, or the FOIA litigation. Plaintiffs also discussed those three projects for the first time in their opposition. *See id.* at 21–23. In short, then, Plaintiffs waited until filing their opposition to allege the facts that might support standing based on expenditure of resources. But a plaintiff cannot use an opposition brief to amend its complaint. *See, e.g.*, *Texas Low*

14

*Income Hous. Info. Serv. v. Carson*, No. 18-cv-644, 2019 WL 6498816, at *8 n.1 (D.D.C. Dec. 3, 2019).

In *Texas Low Income Housing*, the plaintiff raised a theory of informational injury in its opposition. *Id.* at *8. Judge Kelly rejected this theory because the plaintiff "failed to plead an injury stemming from lack of information in its complaint." *Id.* The complaint instead relied on an "expenditure of resources" theory. *Id.* The same problem exists here, just in reverse. Simply put, nothing in the First Amended Complaint touches on an injury stemming from expenditure of resources.

Plaintiffs' third and final theory of organizational standing suffers the same defect. The opposition brief suggests that DOJ has funded "local and state terrorism programs that attempt to discredit" Plaintiffs. Opp'n at 23. The First Amended Complaint does not make this allegation (or anything close to it).

\* \* \*

Apparently recognizing the deficiencies of their First Amended Complaint, Plaintiffs make a last-ditch request in the final paragraph of their opposition brief. They ask for "an opportunity to submit additional and more detailed standing evidence via an evidentiary hearing or in the alternative via submission of standing declarations." Opp'n at 34–35. The Court will not give Plaintiffs a third bite at the apple. The Government first moved to dismiss before Plaintiffs amended their Complaint. See Mot. to Dismiss, ECF No. 8. One of the Government's arguments for dismissal was that Plaintiffs lacked standing. *See id.* at 1. Despite this notice, Plaintiffs failed to attach any declarations in support of standing to their First Amended Complaint. They also could have submitted these declarations along with their opposition and made an argument for why the Court should consider them. But they did not.

It is Plaintiffs' burden to show jurisdiction, see *Lujan*, 504 U.S. at 561, and they failed to do so before the motion to dismiss ripened. Their chance has passed. *Cf. Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) ("Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction."). In any event, submission of additional "standing evidence" would be futile given the Court's conclusion in Section III.A. The standing of all three Plaintiffs hinges on their (unsuccessful) theory of informational injury.

**IV.**

Because Plaintiffs fail to establish standing under the theories they advance, the Court will grant the Government's motion and dismiss the First Amended Complaint. *See Friends of Animals*, 828 F.3d at 995. A separate Order will issue.

Dated: January 3, 2020                              TREVOR N. McFADDEN, U.S.D.J.